**In The**

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-18-00422-CR**
**NO. 09-18-00423-CR**

_____

**DUSTIN RAY SANDERS, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 9th District Court**
**Montgomery County, Texas**
**Trial Cause Nos. 18-03-02909-CR and 18-05-06810-CR**

**MEMORANDUM OPINION**

Dustin Ray Sanders appeals from two judgments, tried before the same jury, which found him guilty on two counts of assault, both involving assaults the jury found were committed against *Hannah* (his girlfriend).[1] In three appellate issues,

_____

[1]*Hannah* is a pseudonym, which we have used to refer to Sanders' girlfriend to disguise her true identity. *See* Tex. Const. art. I, § 30(a)(1) (granting crime victims

1

Sanders argues he is entitled to a new trial because the trial court erred by admitting evidence in the guilt-innocence and in the punishment phases of his trial. We conclude Sanders' issues lack merit, so we will affirm.

Background

We first discuss the background of Sanders' case, presenting the evidence in the light most favorable to the jury's verdict.[2] The evidence before the jury in the trial shows that in December 2017, Sanders and Hannah met at a home owned by Sanders' aunt, *Raquel*.[3] Hannah, Sanders, Raquel, and Raquel's boyfriend were in the same room in the home when another couple entered the room. When the additional visitors entered the room, Sanders left without saying why he decided to leave. A short time later, Sanders called Hannah on her phone, asking whether she "was going to stay." Hannah told Sanders she had decided to stay because he left. After that, Sanders returned to the room, displayed a pistol, and Hannah left with him because, based on Sanders' actions, she thought he didn't want her to remain in

---

"the right to be treated with fairness and with respect for the victim's dignity and privacy throughout the criminal justice process"). Sanders' indictments allege he violated section 22.01(b)(2)(A) and section 22.02(a)(2) of the Texas Penal Code. *See also* Tex. Fam. Code Ann. § 71.0021(b) (defining dating relationship).

[2]*See Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979); *Powell v. State*, 194 S.W.3d 503, 506 (Tex. Crim. App. 2006).

[3]A pseudonym.

the room. Eventually, Sanders drove away from Raquel's house, and Hannah went back inside.

Later that same night, Sanders sent Hannah a message on her phone. According to Hannah, in the message, Sanders told her to go over to his home. Hannah complied, explaining she loved Sanders and thought that, by going to see him, she "could calm him down[.]" When Hannah arrived, Sanders approached her car with a rifle. He told Hannah to move over to the passenger's seat, and he took the wheel. After entering Hannah's car, Sanders placed the rifle next to his leg. After that, the couple drove around several hours while they argued about problems they were having with their relationship.

Sanders took Hannah back to his home around 6:30 or 7:30 that morning. Sitting in the driveway in the car, the couple continued to argue. According to Hannah, Sanders began punching her in the back of her head, grabbed her hair, and "slamm[ed] [her] head into [her] knees" several times. Hannah testified that while in the car, Sanders said: "They won't think it's funny when they find your body in the woods." Hannah testified that she understood Sanders to mean "he was going to kill [her]" with his gun.

Sanders called his mother, Sherry Kirchner, from the car. Sherry promptly went to Sanders' home. After Sherry approached the car, she began questioning

3

Sanders about what had happened. According to Hannah, Sanders once again grabbed her by the hair and slammed her head into her knees. Sherry testified she never saw that happen. Sherry told Sanders to get out of the car, and the three of them began walking toward Sanders' home. As they were approaching the house, Sherry, according to Hannah, told her "she was going to get [her] out of there as soon as she could." At that point, according to Hannah, Sanders turned around and pointed the gun at her head. Hannah testified that Sanders said: "[H]e was going to shoot [her]." Hannah testified that Sherry then stepped between them and told Sanders: "[I]f you're going to shoot anybody, you're going to shoot me."

Sherry and Hannah stayed at Sanders' home for several hours after entering the home. At one point, however, Sherry and Hannah left without taking Sanders with them. The two women went to a gas station, where they played a video game. Around noon, Sanders' employer came to Sanders' house and picked him up. A short time later, Hannah drove her car from Sanders' house to Raquel's, where she met her sister. Hannah's sister then followed Hannah home.

When the prosecutor asked Hannah why she went to Raquel's after leaving Sanders' home, Hanna testified: "Because [Sanders] has threatened my family, and I did not want to put them in danger if he followed me to my house." Following up on that answer, the prosecutor asked Hannah: "When you say he's threatened your

4

family, what are you referring to?" Hannah responded: "He has threatened to burn my mom's house down twice, and he has told me that he was going to go over there and drop bodies[.]" At that point, Sanders' attorney objected, claiming he "thought it was clear that if we're going into extraneous and all these kinds of allegations, that we were going to approach." The trial court overruled Sanders' objection, thereby allowing the jury to consider Hannah's testimony about the threats Hannah described Sanders directed at her parents.

## Analysis

### *Guilt-Innocence Evidence*

### *Extraneous Offense Testimony*

We will first address Sanders' second issue, in which he complains the trial court erred when it allowed Hannah to testify that Sanders had threatened others in her family. In appeals claiming the trial court erred by admitting or excluding evidence, the reviewing court reviews a ruling the trial court made regarding the evidence for abuse of discretion.[4] Under that standard, the reviewing court will not disturb the trial court's ruling if it was correct under any theory of law that applies to the ruling made in the trial.[5]

---

[4]*Devoe v. State*, 354 S.W.3d 457, 469 (Tex. Crim. App. 2011) (citing *Prible v. State*, 175 S.W.3d 724, 731 (Tex. Crim. App. 2005)).
[5]*Id.* (citing *Sewell v. State*, 629 S.W.2d 42, 45 (Tex. Crim. App. 1982)).

5

In his appeal, Sanders argues that Hannah's testimony about the threats he made toward others in her family was inadmissible because it was not relevant to whether he committed the assaults at issue in his appeal. He claims the evidence of his extraneous bad acts—the threats Hannah testified that he made toward members of her family—should have been excluded because the State introduced them to show that, when committing the assaults, he acted in accord with his character for threatening others. In response, the State suggests that Hannah's testimony about the threats was admissible because Sanders opened the door to the testimony by suggesting, during opening statement, that the reason Hannah failed to report the alleged assaults to the police sooner than she did was that Hannah had filed criminal charges that resulted in Sanders' indictment because she was motivated by a desire for revenge due to the couple's breakup.

The record reflects that during his opening statement, Sanders' attorney said:

[Hannah] has many issues. And we're going to talk about these. And you're going to get to know her. And one of her issues is she's just not truthful. And she is being vindictive about all of this.

Along with the above statement, Sanders' attorney made several remarks suggesting Hannah had filed a false report when she reported the assaults to the police. For example, Sanders' attorney, in his opening statement, suggested the evidence during

6

the trial would show that Hannah's conduct after leaving with Sanders' mother was inconsistent with her subsequent claim that she had been the victim of a recent crime.

On appeal, Sanders argues that Hannah's testimony about the threats was not relevant to proving he committed the assaults and that it was more prejudicial than probative to proving any facts of consequence in his trial. Under Rule 402 of the Texas Rules of Evidence, relevant evidence is admissible unless a statute or rule provides otherwise.[6] Under Rule 404(a), a party may not use evidence of a person's character or character trait at trial "to prove that on a particular occasion the person acted in accordance with the character trait."[7]

Generally, Rule 404(b) of the Rules of Evidence prohibits a party from introducing evidence about another party's bad acts or conduct when the extraneous bad acts being proven are not the subject of the conduct at issue in the trial.[8] But the prohibition that exists in Rule 404(b) to admitting evidence about a party's character is not absolute, as the Rule contains several exceptions.[9] And to be sure, even the

---

[6]Tex. R. Evid. 402.

[7]*Id*. 404(a)(1).

[8]*Id.* 404(b)(1) ("Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.").

[9]*Id.* 404(b)(2) (allowing trial courts to admit evidence of extraneous crimes or bad acts when relevant to proving the defendant's "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident" on a matter being tried).

exceptions in the Rule are not exhaustive.[10] In its brief, the State argues that one of the exceptions to Rule 404(b) allows parties to introduce evidence of an otherwise unrelated bad act that reveals a party's character trait when the opposing party, during the defendant's trial, opens the door to such evidence and makes it relevant to an issue in dispute. Here, the State argues that Sanders' attorney opened the door in opening statement by suggesting that Hannah's delay reporting the assaults showed that she was lying about them. Based on its suggestion that by raising the issue of why Hannah delayed reporting the assault, the State argues that Sanders opened the door to Hannah's right to explain why she did not immediately report the assaults.[11]

Under Texas law, while "[a] defensive opening statement is not itself evidence, the statement does inform the jury and the State of the nature of the defense to be raised and the State may rebut this anticipated defensive evidence in its case-in-chief."[12] The trial court could have reasonably decided that questioning why Hannah failed to report Sanders for assaulting her sooner than she did, Sanders

---

[10]*Montgomery v. State*, 810 S.W.2d 372, 388 (Tex. Crim. App. 1991) (op. on reh'g).

[11]*Bass v. State*, 270 S.W.3d 557, 563 (Tex. Crim. App. 2008).

[12]*Dabney v. State*, 492 S.W.3d 309, 317 (Tex. Crim. App. 2016); *see also Powell v. State,* 63 S.W.3d 435, 439 (Tex. Crim. App. 2001) (noting the State may rebut the theory of defense raised by the defendant in his trial by using evidence to show the defendant committed other relevant crimes, wrongs, or bad acts).

opened the door to allowing Hannah to explain the reasons that she delayed accusing Sanders of assaulting her. In the trial, Hannah testified the delay occurred because Sanders had threatened to harm members of her family earlier.[13] We conclude the trial court did not abuse its discretion by allowing Hannah to rebut Sanders' suggestion in opening statement so the jury could consider whether to accept Hannah's explanation for the delay rather than the one suggested by Sanders' attorney.[14]

Next, we address Sanders' argument claiming Hannah's testimony about the threats was more prejudicial than probative to any facts of consequence at issue in his trial. Under Rule 403 of the Texas Rules of Evidence, trial courts may exclude evidence, even when relevant, if the trial court finds the probative value of the evidence is outweighed by the danger that admitting it is unfairly prejudicial to a party involved in the trial.[15] Generally speaking, evidence that has relevance is viewed as being more probative than prejudicial.[16] And when reviewing a trial

---

[13]*See* Tex. R. Evid. 404(b)(2) (allowing a party to use character evidence when relevant to issues involving a person's motive).

[14]*See Santellan v. State*, 939 S.W.2d 155, 169 (Tex. Crim. App. 1997) (explaining why evidence of an extraneous bad act must have relevance beyond its character conformity value to be relevant and admissible for that purpose during the defendant's trial).

[15]Tex. R. Evid. 403.

[16]*Santellan*, 939 S.W.2d at 169.

court's decision admitting evidence, we must uphold the ruling the trial court made unless the ruling to admit falls outside the zone of reasonable disagreement.[17] To review evidentiary rulings, we consider whether the record shows the trial court balanced the probative value of the evidence against its danger of unfair prejudice when it admitted the evidence in the trial.[18] We also weigh whether the ruling the trial court made to admit the evidence was arbitrary or capricious.[19]

Generally, to evaluate a defendant's objection that the probative value of the evidence was more prejudicial than probative, courts examine four factors:

- The probative value of the evidence;
- The potential that evidence about the extraneous bad act or wrong has to impress the jury in some irrational and indelible way;
- The time it took to develop the evidence of the extraneous bad act or wrong; and
- The proponent's need to develop the evidence of the extraneous bad act or wrong in the trial.[20]

We have already explained why the evidence about the threats Sanders made were relevant, since Hannah's testimony allowed the jury to consider Hannah's account explaining why she did not report Sanders to police sooner than she did. Since the jury had the right to accept Hannah's testimony as a reasonable explanation

---

[17]*Montgomery*, 810 S.W.2d at 392.
[18]*Id.*
[19]*Id.*
[20]*See Wyatt v. State*, 23 S.W.3d 18, 26 (Tex. Crim. App. 2000).

for her delay, we conclude Hannah's testimony about it was unlikely to impress the jury in an irrational and indelible way. For instance, when Hannah explained why she drove to Raquel's home (instead of going to the police) after leaving Sanders' home, she testified: "I did not want to put my family in danger by going to my house where he could follow me." It also took very little time for the State to develop the testimony to allow Hannah to explain her delay. Moreover, given Sanders' claim that the delay showed that Hannah was lying about the assaults, Hannah had the right to offer an explanation and the jury had the right to decide whether the explanation she offered was reasonable. The State also needed the evidence, since Hannah was the only eyewitness who testified that Sanders assaulted her during the guilt-innocence phase of her trial, as Sanders raised questions in the trial about whether she was being truthful.

We conclude the trial court did not abuse its discretion by overruling Sanders' objections to Hannah's testimony about the threats. For that reason, we overrule Sanders' first issue.

*Punishment Evidence*

*Mental Health Records*

Next, we address Sanders' first issue, in which he argues the trial court abused its discretion by refusing to admit records from three healthcare facilities into

11

evidence during the punishment phase of his trial.[21] We review a trial court's decision admitting or excluding evidence in a trial's punishment phase under an abuse-of-discretion standard.[22] We will not disturb the ruling the trial court made absent an abuse of discretion.[23]

The records Sanders sought to introduce contain information suggesting the records are from three healthcare facilities, the University of Texas Harris County Psychiatric Center, Tri-County MHMR Services, and Southwest Medical Group. Sanders tried to lay the predicate to have the records admitted into evidence through Emily Daniel, Montgomery County's Mental Health Court Services Case Manager. Daniel testified she acquired the records from the facilities based on an authorization Sanders signed so that he could have reviewed the records to prepare for his trial. When Sanders offered the records into evidence at trial, however, the State objected to them, arguing that Sanders had not laid a sufficient predicate to gain their admission based on the requirements in Rule 803(6), which is the business records exception to the hearsay rule.

---

[21]*Ramos v. State*, 245 S.W.3d 410, 418 (Tex. Crim. App. 2008) (explaining that rulings admitting or excluding evidence are reviewed upon appeal for abuse of discretion).

[22]*See Beham v. State*, 559 S.W.3d 474, 478 (Tex. Crim. App. 2018); *Davis v. State*, 329 S.W.3d 798, 803 (Tex. Crim. App. 2010).

[23]*Beham*, 559 S.W.3d at 478; *McGee v. State*, 233 S.W.3d 315, 318 (Tex. Crim. App. 2007).

When the State argued its objection, the prosecutor noted that Daniel did not work for the healthcare facilities that created the records and suggested she did not know the policies and procedures followed at those facilities in creating and maintaining their respective records. The trial court sustained the objection, so the jury never considered the exact information that is in the records in the trial.

On appeal, Sanders suggests the trial court abused its discretion by excluding the records from evidence for two reasons. First, he argues that Daniel's testimony established the records were business records of the facilities that sent her the records. Second, Sanders argues that, by excluding the records, the trial court violated his constitutional right to a fair punishment hearing because his attorney could have used the information in the records to argue he should be given a shorter sentence.

The business records rule, Rule 803(6) of the Texas Rules of Evidence, allows trial courts to admit a business record into evidence if the party offering the record proves five things:

> (A) the record was made at or near the time by – or from information transmitted by – someone with knowledge;
> (B) the record was kept in the course of a regularly conducted business activity;
> (C) making the record was a regular practice of that activity;
> (D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by an affidavit or unsworn declaration that complies with Rule 902(10); and

> (E) the opponent fails to demonstrate that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.[24]

Under Rule 803(6), a business record, even when created by another entity, may be admissible if the record has become the primary record of an underlying transaction relied on by the other entity as a substitute for having its own record.[25]

Here, Sanders argues that Daniel was qualified to establish the records were business records and as such admissible under the business records exception, Rule 803(6). Yet Daniel's testimony shows that she never testified the Montgomery County Mental Health Court considers healthcare provider records it secures for defendants involved in litigation to be the Mental Health Court's primary record.[26] And while Sanders points out that Rule 803(6) does not require the custodian of a business record to be the person who created the record or to be employed by the business that created the record,[27] the party offering the record must still establish the witness knows the record was made at or near the time reflected in the record

---

[24]Tex. R. Evid. 803(6).

[25]*Riddle v. Unifund CCR Partners*, 298 S.W.3d 780, 782 (Tex. App.—El Paso 2009, no pet.).

[26]Instead, Daniel testified on cross-examination that she did not know what the practices were of the facilities that created the records and that she did not know what practices they followed to maintain them.

[27]Tex. R. Evid. 803(6)(D) (allowing the predicate to be laid through the testimony of the custodian of the records or by "another qualified witness").

and made from information acquired by someone who has knowledge of what the record contains.[28] Daniel's testimony does reflect she testified to these facts.[29]

Finally, Sanders contends the trial court violated his right to a fair punishment hearing by excluding the records from the evidence in his trial. But when Sanders was before the trial court, he never objected to the trial court's ruling on the basis that its ruling deprived him of his constitutional rights. Instead, he merely argued the records were admissible as business records under Rule 803(6).

We conclude Sanders failed to properly preserve his complaint that he was deprived of a constitutional right because he failed to object to the ruling on that basis in his trial.[30] By failing to raise the argument in the trial court and then by bringing it up for the first time in his appeal, Sanders waived his arguments that claim the trial court denied his constitutionally protected right to receive a fair trial.[31]

---

[28]*Id*. 803(6)(A).

[29]*Id.*

[30]Tex. R. App. P. 33.1 (preserving error for appellate review requires the complaining party to show that he presented his complaint to the trial court in a timely request, objection, or motion and that the trial court ruled on the request).

[31]*See Wilson v. State*, 71 S.W.3d 346, 349 (Tex. Crim. App. 2002) (explaining the record must show that the claim being made in the appeal is one that the appellant brought to the trial court's attention during the trial); *Broxton v. State*, 909 S.W.2d 912, 918 (Tex. Crim. App. 1995) (holding the appellant waived his due process claims to the evidence the State presented in the defendant's trial by failing to make that claim during the trial).

*Gang Identification Card*

In Sanders' third issue, he argues the trial court erred by admitting a gang identification card, created by the Montgomery County Sheriff's Office, into evidence because admitting the gang card exhibit violated his right to confront the witnesses the State used against him in his trial.[32] The State marked the gang identification card as Exhibit 26. The exhibit reflects the Montgomery County Sherriff's Office identified Sanders as a member of the gang Aryan Brotherhood of Texas. The second page of the exhibit contains a checklist, comprised of eight items. Most boxes by the items in the list are not marked, but the testimony in the trial shows that the Sheriff's Office used the checklist in the form as part of the procedure it followed to identify whether someone who has been jailed belongs to a gang.

Sanders' appellate arguments focus on one of the items in the eight-item checklist, which has a box that was filled in with an "x." The text next to that box states: "Identification of the individual as a criminal street gang member by a reliable informant or individual." Sanders contends the line next to this box in the exhibit was testimonial and that the trial court admitted the exhibit containing the box

---

[32]U.S. CONST. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him[.]").

16

marked with the "x" in violation of his right to confront the witnesses the State had used against him in his trial.

In response, the State argues that Sanders failed to lodge a Confrontation Clause objection that would have alerted the trial court to his complaint about the information next to the box marked with the "x." According to the State, the objection Sanders raised in the trial to the exhibit concerned whether Ben Nichols, the Montgomery County Sheriff's Office employee the State used to authenticate Exhibit 26, was the person who filled out the information that is in the form. Thus, the State concludes: "Nothing about [Sanders'] objection would have alerted the trial court to [Sanders'] complaint on appeal about the single line regarding the informant's corroboration within the nineteen-page exhibit."

We agree. The argument Sanders presents in his appeal does not comport with the objections that he made to Exhibit 26 in his trial.[33] "In determining whether a complaint on appeal comports with a complaint made at trial, we look to the context of the objection and the shared understanding of the parties at the time."[34] When a party fails to object to an alleged constitutional error in the trial and complains about

---

[33]*See Clark v. State*, 365 S.W.3d 333, 339 (Tex. Crim. App. 2012); *Reyna v. State*, 168 S.W.3d 173, 177 (Tex. Crim. App. 2005).
[34]*Clark*, 365 S.W.3d at 339.

the error for the first time in his appeal, the error is one that the reviewing court will generally determine was not properly preserved for review.[35]

Here, Nichols' testimony reflects the trial court believed Nichols when he testified that he is the person who prepared Exhibit 26. When it became apparent in the trial that Sanders' attorney questioned whether Nichols prepared the exhibit, the prosecutor asked Nichols who prepared it. Nichols also explained that he is the person that gathers information on individuals placed in jail in discharging his duties to the Sheriff's Office, which include identifying and documenting "gang members that come within the [jail.]" When the State offered Exhibit 26 into evidence, Sanders objected, claiming that because Nichols was not the person who authored the exhibit, asserting that as a result, admitting the exhibit would violate his rights to confront the witnesses the State was using against him in his trial. But the objection that Sanders made focused the court and parties on whether Nichols gathered the information in the exhibit, and nothing about the discussion related to the objection Sanders made in the trial court would have alerted anyone that Sanders was complaining about one of the boxes within the form indicating that Nichols

---

[35]*Briggs v. State*, 789 S.W.2d 918, 924 (Tex. Crim. App. 1990); *Davis v. State*, 313 S.W.3d 317, 347 (Tex. Crim. App. 2010).

acquired some of the information he included in the form from a confidential source in the jail.[36]

In our view, the objection Sanders lodged to the exhibit failed to alert the trial court to the complaint he makes here, particularly since the entry he complains about is found on a single line in a multiple-page document. Sanders never pointed out that item to the trial court as the basis of his objection to the exhibit during his trial. Instead, Sanders' objection and the discussion that ensued about it reflects that Sanders' attorney, the prosecutor, and the trial court all shared an understanding that Sanders was objecting because he believed (mistakenly) that Nichols was not the person who gathered the information and assembled it into the form.[37] In his appeal, Sanders has not pursued that argument, likely given Nichols' testimony and the trial court's implied finding that Nichols is the person who gathered the information and then typed it into the exhibit.

We conclude Sanders failed to preserve the argument he relies on in issue three for our review in the appeal. For that reason, issue three is overruled.[38]

---

[36]Tex. R. App. P. 33.1.

[37]*See Pena v. State*, 285 S.W.3d 459, 464 (Tex. Crim. App. 2009) ("To avoid forfeiting a complaint on appeal, the party must 'let the trial judge know what he wants, why he thinks he is entitled to it, and [he must] do so clearly enough for the judge to understand him at a time when the judge is in the proper position to do something about it.'").

[38]*See Thomas v. State*, 505 S.W.3d 916, 924 (Tex. Crim. App. 2016).

Conclusion

We hold Sanders' issues either lack merit or were not properly preserved for our review. Accordingly, the trial court's judgment is

AFFIRMED.

_____
HOLLIS HORTON
Justice

Submitted on August 17, 2020
Opinion Delivered January 27, 2021
Do Not Publish

Before Golemon, C.J., Kreger and Horton, JJ.